ISAAC SOMMERS and Others, Respondents and Appellants, *v.* LEON COTTENTIN and Others, Appellants and Respondents.

*Fraudulent conveyances to secure* bona fide *indebtednesses — to make them void, the creditors must have participated in the fraud — effect of a provision that the surplus is to be returned to the debtor; of the debtor's remaining in possession, and of the debtor and creditors being represented by the same attorneys — a wife charged with notice of her husband's fraudulent intent — presumption from there being no change of possession.*

In order that an ulterior purpose, upon the part of a debtor, who has made conveyances of and created incumbrances upon his property for the purpose of securing *bona fide* indebtednesses, to reserve to himself the control and possession of the property transferred or incumbered until the creditors so secured should enforce their rights under the instruments, shall render the transfers void, the intent must have been shared by the creditors, or those acting for them.

The fact that some of the instruments provide that, in certain events of default, the surplus arising shall be given to the debtor, and that he shall remain in

possession of the property covered by the chattel mortgages until default shall be made thereunder, does not invalidate the transfers nor impute to the creditors an assent to or complicity in the ulterior purpose of the debtor.

The fact that the attorneys for the debtor were also the attorneys for the creditors is insufficient to show knowledge upon the part of the creditors of the debtor's fraudulent intent, where it does not appear that the attorneys knew of such intent.

The wife of a debtor, to whom the debtor has transferred a portion of his property for the purpose of defrauding his creditors, is chargeable with knowledge of her husband's guilty purpose where it appears that she took no part in the transaction personally, but constituted her husband her agent in regard to the matter, and was perfectly content to let her husband do what he pleased in regard to the property.

*Semble*, that the presumption of fraud in a sale of personalty, resulting from the fact that the possession of the articles transferred was not changed, may be rebutted by proof that the transfer was made in good faith, without any excuse being shown for there having been no change of possession of the articles under the transfer.

APPEAL by the plaintiffs, Isaac Sommers and others, from portions of, and by the defendants, Leon Cottentin and others, from the whole of, a final judgment of the Supreme Court, entered in the office of the clerk of the county of New York on the 3d day of May, 1897, upon the report of a referee, an interlocutory judgment entered in said clerk's office on the 22d day of May, 1895, upon the report of a referee, and an order entered in said clerk's office on the 13th day of April, 1897, overruling exceptions to the report of the referee appointed under the interlocutory judgment.

*G. C. Comstock*, for the plaintiffs.

*Louis Marshall*, for the defendants.

PATTERSON, J.:

These are cross-appeals, the defendants appealing from both an interlocutory and a final judgment. The cause was tried before a referee appointed to hear and determine the issues. His report was confirmed and an interlocutory judgment was entered thereon, by which certain conveyances, mortgages and transfers of property were declared to be fraudulent and void as against the plaintiffs, judgment creditors of the defendant Leon Cottentin. By such interlocutory judgment another referee was appointed to take and state an account and determine and report what property and assets

or the proceeds thereof had come into the hands of the defendants, which should be paid over to a receiver (also appointed in such interlocutory judgment) of the property, assets and effects of Leon Cottentin, transferred or incumbered by the conveyances or transfers aforesaid. The referee named in the interlocutory judgment made his report, in which he specified what real and personal property of the defendant Leon Cottentin had passed under the conveyances and transfers declared by the interlocutory judgment to have been fraudulently made, and also found that the defendant Beadleston & Worz was accountable to the receiver for the value of personal property received by it from the defendant Leon Cottentin in the sum of $3,250, and also for the sum of $406.75; that the defendant Marie Cottentin was accountable to the receiver for the amount of $3,250 and also for an additional sum of $850; that the defendant Francois Drizal was accountable for the same sum as the defendant Marie Cottentin, but that the real property affected by the fraudulent conveyances had been sold under prior incumbrances and that no surplus was realized. Upon the coming in of the report final judgment was entered confirming it in all respects and directing the defendant Beadleston & Worz forthwith to pay over and deliver to the receiver the sum of $3,250 and also the sum of $406.75, with interest on both sums from August 23, 1893, and also directing the defendant Marie Cottentin forthwith to deliver to the receiver the sum of $3,250 and an additional sum of $850, with interest from the 24th of May, 1894, and the same direction was made with reference to payment being made by the defendant Francois Drizal. The final judgment then provided that the payment by either of the three parties should be credited to the others, and that full payment of the judgment entered against any defendant, or any part payment by any defendant against whom a judgment has been entered, should operate as a satisfaction or payment *pro tanto* of the judgment entered against such defendant, both in this action and in another action by other plaintiffs seeking the same relief against the alleged fraudulent conveyances and transfers.

The defendants appeal from the whole of the interlocutory and final judgments. The plaintiffs excepted to so much of the report of the referee on the trial of the issues as directed costs to be paid out of the moneys recovered from the defendants, and insisted that

such costs should be paid by the defendants personally. The plaintiffs also excepted to portions of the decision of the referee appointed under the interlocutory judgment which affected the amounts to be paid by the defendants respectively, and insist that the defendant Beadleston & Worz should be chargeable with all amounts, the proceeds of the transferred property. The defendant Ditmar and the defendants Cottentin and the defendant Drizal in their notice of appeal from the final judgment gave notice of their intention to bring up for review the interlocutory judgment.

The action was brought to have declared fraudulent and void and to set aside a number of conveyances of realty, mortgages, chattel mortgages and transfers of personal property, all of which property prior to the 5th of August, 1893, belonged to the defendant Leon Cottentin. The property affected consisted in part of real estate in New Jersey, upon which were then outstanding large incumbrances, also a restaurant in the city of New York and its appointments, including a stock of wines, liquors, supplies and other merchandise used in the business. Leon Cottentin also at that time had certain contracts for furnishing meals to the employees of large corporations having their offices in the city of New York. On the day mentioned and previously, in the conduct of his business in the New York restaurant and in supplying food under the contracts referred to, he was assisted by his wife, his daughter, the defendant Drizal, and he also employed a number of servants in the conduct of his business in the restaurant. Finding on the day mentioned that the restaurant enterprise in which he had invested large sums of money was not successful, and that he was financially embarrassed and unable to pay his debts, he desired to make provision for securing certain of his creditors to the exclusion of others. Thereupon he sought the advice of a firm of reputable lawyers, who at the same time happened to be the legal advisers of some, if not all, of the creditors he wished to protect. As a result of his conferences with his counsel, a deed of trust was made by Leon Cottentin to the defendant Ditmar, who was a clerk in the office of the attorneys referred to, and by that deed of trust certain property at Long Branch, in New Jersey, was conveyed to the trustee to secure eight creditors named for indebtedness actually due them — including an indebtedness of $2,782, to the defendant Beadleston & Worz, a New York

corporation. In addition to the debt of Beadleston & Worz, thus secured by the mortgage on the New Jersey property, there was another indebtedness of Leon Cottentin to that corporation, amounting to $5,000. The latter indebtedness is that which gives rise to the most important question in the case. At the same time at which this trust deed was made Leon Cottentin executed and delivered to Ditmar, as trustee, a mortgage, which covered the lease of the restaurant premises in the city of New York, and the fixtures therein. Two days before he had executed a mortgage to his wife upon the lease and chattels in the restaurant, to secure her debt of $5,220. This mortgage to the wife ranked in advance of the trust mortgage for the benefit of the creditors named in the trust deed. Mrs. Cottentin did not join in the deed of the New Jersey property, so that her dower therein was not affected thereby. In some of the instruments there was a provision for paying surplus realized on sales of the property to Cottentin. The instruments thus far referred to did not cover all the property belonging to Leon Cottentin. He had remaining the stock of liquors and wines and supplies, to which reference has been made. That merchandise was supposed to be worth in the aggregate, at a rough valuation, about $5,000. Cottentin owed that amount to Beadleston & Worz, in addition to the sum mentioned in the deed of trust. Cottentin disposed of this merchandise and all the chattels, furniture and fixtures, by transferring them by a bill of sale to Beadleston & Worz. The chattels, furniture and fixtures were transferred subject to the mortgage of Mrs. Cottentin. The bill of sale from Cottentin to Beadleston & Worz was dated August 3, 1893. On August 5, 1893, Beadleston & Worz made a bill of sale of this same property, subject to the same mortgage, to N. P. Abbott, one of its employees. An inspection of this stock of merchandise was made by an agent of Beadleston & Worz before the transfer was made, and its value was fixed at $5,000. When the property was transferred the $5,000 indebtedness to Beadleston & Worz was actually canceled. It had existed in the shape of a promissory note, and it was agreed that that note should be surrendered when the transfer of the personal property was made; at least, instructions were given to the attorney at law to make the surrender. Abbott took formal possession of the property; the restaurant business was continued; there was a sym-

bolical delivery of the restaurant to Abbott by turning over the keys to him, the liquor tax certificate was transferred to him, but thereafter Leon Cottentin did actually stay upon the premises and manage the business of the restaurant with substantially the same assistants and in substantially the same manner as before. Nevertheless, Abbott supervised the business, employed Cottentin at a salary of thirty-five dollars a week, which, however, Cottentin paid himself by drawing a few dollars at a time, as occasion required, but the profits of the business, after the transfer to Beadleston & Worz, and until the retransfer, presently to be mentioned, were taken by Abbott for Beadleston & Worz, and are charged against Beadleston & Worz by the referee before whom the issues were tried. Meantime a change had also taken place with reference to the contracts Cottentin had to furnish meals or food to the employees of the several corporations above referred to. All that business had passed into the hands of Mrs. Cottentin and Drizal. There was no specific written transfer of these contracts made, but nominally, at least, that business passed out of the hands of Cottentin as the contractor to furnish meals; which were, however, furnished from the restaurant. The relations of Beadleston & Worz or Abbott to the restaurant, the fixtures and the stock of merchandise continued until August 23, 1893, when it was ascertained that Pottberg, the agent of Beadleston & Worz, who made the original appraisement of the merchandise, had put an excessive estimate of value upon it, and thereupon negotiations were had which eventuated in a rescission of the sale and transfer, and the reinstatement of the parties to that bill of sale and transfer in the position they occupied before it was made. Beadleston & Worz retransferred all that it had acquired by that transaction to Leon Cottentin. The debt to Beadleston & Worz was revived, a new note for the amount was given, and by a consent of the other beneficiaries under the trust deed to Ditmar, Beadleston & Worz were allowed to come in and be secured by that trust deed for the $5,000 note thus given. As an inducement to the creditors to allow this to be done, Mrs. Cottentin released her dower in the real estate in New Jersey. Thereupon Beadleston & Worz seem to have withdrawn from all further connection with the matter. Mrs. Cottentin and Drizal then entered into an arrangement for carrying on the restaurant business and Leon Cottentin transferred to them his interest,

whatever it may have been, in the restaurant and its equipment, but continued as the manager of the business. All these transfers were made before the plaintiffs in this action recovered their judgments, but the debts to them were due and owing from before the 3d of August, 1893.

The foregoing are the material facts to be considered. It is charged in the complaint that all these transfers and transactions were made with a fraudulent intent and purpose; that the defendant Leon Cottentin, being wholly insolvent on the 5th of August, 1893, and the other defendants knowing that he was thus wholly insolvent, entered with them into a scheme, having for its object the conveyance to them of everything of which he was possessed, in such manner and with such effect that his debts to them should be secured out of the property conveyed, in preference to the claims of other creditors, and that in the meantime the property so conveyed should continue in the possession and control and management of the defendant Leon Cottentin and to his use, so that such property might not be seized or taken on execution or process against the said Leon Cottentin by other creditors, and so that the payment of the indebtedness of the other creditors might be hindered and delayed until such time as the defendant Leon Cottentin might be able to pay or compromise or otherwise settle his indebtedness with such unsecured and unprotected creditors. These averments of the complaint charge actual fraud and conspiracy. The referee before whom the issues were tried did not find that a specific agreement was made between the parties with the object or looking to the purpose set forth in these averments of the complaint, but he did find that an unlawful scheme was entered into by all the defendants prior to the making of the alleged transfers, with the intent that the defendant Leon Cottentin should convey to the other defendants all, or substantially all, of his property to secure their claims in preference to the claims of other creditors, including the plaintiffs, and " that at the same time the said property so transferred should remain in the possession of, under the control and management of, the defendant Leon Cottentin, and to his future use, and should not be seized upon or taken by any of the other creditors, including the plaintiffs, of the defendant Leon Cottentin by virtue of any process or processes issued at their instance, and with the intent that

FIRST DEPARTMENT, FEBRUARY TERM, 1898.          [Vol. 26.

the payment of such other claims and of such other creditors might be unduly hindered and delayed." That referee also decided that the defendant or defendants to whom such alleged transfers are stated in the complaint to have been made, aided in the scheme and participated in such intent. The referee thus found upon the evidence the elements necessary in law to avoid these instruments. He expressly found mutuality in the design of hindering and delaying creditors, but he also found that every indebtedness secured by all or either of the conveyances, mortgages or transfers attacked, was a subsisting, valid, enforcible indebtedness; that is to say, he found that when the alleged scheme was entered into, the defendant Leon Cottentin was indebted to the eight creditors named in the trust deed to Ditmar, and he also found that on August 5, 1893, the defendant Leon Cottentin was indebted to his wife, the defendant Marie A. Cottentin, in the sum of $5,220. We have, then, to start with in the examination of the case, the fact which the referee properly found — that all the creditors secured or sought to be secured by the instruments impeached in this action were *bona fide* creditors. It is not claimed that Leon Cottentin could not lawfully prefer all or either of them by making transfers of, or incumbrances upon, or by the delivery of, specific property, either in payment or as security for their debts; nor is it claimed that any delay or hindrance which other creditors would be subjected to by reason of such conveyances, incumbrances or transfers, would render them *ipso facto* void; nor is it contended that an ulterior purpose or intent of Leon Cottentin to secure to himself the control and possession of the property transferred or incumbered until the creditors preferred should resort to the enforcement of their rights under the instruments, would of itself invalidate those instruments, unless it be the chattel mortgage to Ditmar as trustee. It is conceded that that intent must have been shared in in this particular case by the creditors or those acting for them, because the creditors took for value. We are not informed of the legal ground upon which the learned trial referee based his decision, except so far as it was founded upon his understanding of the evidence as establishing some scheme or arrangement entered into, looking beyond the mere security of the creditors and having for its ultimate object the retention of the property and business in the hands of the debtor Cottentin, safe from the

pursuit of other creditors. It would seem that the decision must have been based upon inferences drawn from the general history of the whole transaction and the circumstances of the case. If it were, the inferences were not justified. There is no proof whatever from the beginning to the end of this record, of any agreement entered into between the preferred creditors and Cottentin to give him any advantage or accommodation by way of delay or otherwise out of these various transactions. It is shown, however, that Cottentin himself was looking to such advantage, expected it, and entered into the arrangement with the intention of securing it. That is shown by the testimony of four witnesses, and also by the letter written by one of the plaintiffs and certified to by Cottentin as being "entirely correct." But his intent is not controlling. These were not voluntary conveyances, that is, not without present considera-tion. Each one of the creditors secured had a perfect right to receive that security and Cottentin also had the right to grant it. But if these creditors did not receive the transfers in good faith, if they became parties in any way to his purpose of maintaining pos-session and control and the use to his own benefit of the property to gain time and keep off his unsecured creditors, then they became parties to the purpose in such a way as to make the conveyance fraudulent and to require that they be set aside by the court.

In this connection it is proper to state that nothing is to be inferred against the lawful character of the transfers and instru-ments, and nothing is to be imputed to the preferred creditors by way of assent to or complicity in any ulterior purpose of Leon Cot-tentin, from the mere fact that some of the instruments provided that, in certain events of default, the surplus arising should be given to Cottentin or that he should remain in possession under the chattel mortgages until default was made thereon. When the case was before the learned trial referee, he might have been justified in bas-ing his decision upon the provisions of the instruments referred to, for it had been expressly decided in *Delaney* v. *Valentine* (80 Hun, 476) that such a mortgage as that made to Ditmar was invalid, because it contained a resulting trust in favor of the mortgagor aris-ing from the provision that the overplus should be returned to the mortgagor. That ruling was, however, reversed, and the contrary

doctrine announced by the Court of Appeals on an appeal to that tribunal in the same case, the decision of that court having been announced since these appeals were argued at the bar of this court (154 N. Y. 692). This consideration applies to the mortgage on chattels in the Cortlandt street premises, and is of importance only with reference to that feature of the case. Upon considering all the evidence with reference to the general finding of the trial referee, that all the transfers and all the instruments sought to be impeached here were fraudulent because of a participation of the creditors preferred in the unlawful intent of Leon Cottentin, we discover nothing to justify that finding in any relation which any individual creditor thus preferred had to the subject. It is not shown that any one of them had any participation in any negotiations resulting in those conveyances, the only exception being that, in the matter of the claim of Beadleston & Worz upon the $5,000 note, during parts of the transaction, they were represented by Pottsberg or Abbott. The only circumstance from which knowledge of any ulterior intent on Cottentin's part can be inferred is, that the same lawyers represented both the creditors and Cottentin in the whole transaction, and that Ditmar, who was selected as trustee, was a clerk in the office of those lawyers. It is not to be denied that knowledge or notice to the agent of creditors thus preferred would be imputed as knowledge or notice to themselves, but there is nothing on the whole record to show that the attorneys, or Ditmar, actually knew of any such ulterior purpose. Ditmar swears that he did not, and there is no proof, even inferentially, that the attorneys did. The transactions themselves were not of such a character as would necessarily have compelled these attorneys to know that Cottentin had in mind something more than to secure his creditors in a lawful and proper way. That embarrassment would arise and suspicion be excited from the fact that the same attorneys represented both parties to transactions of this character, may be true, but it seems to be apparent from this whole record that each one of the transactions being in itself entirely lawful there was no good reason why the attorneys could not act for both parties, for the direct object to be accomplished was the security of certain creditors who were entitled to take the security precisely as they did ; and had they been represented by other attorneys no question

could possibly have arisen of notice or knowledge imputable to them by reason of the connection of their legal advisers with the matter.

On the facts of the case we do not think that any inference of fraudulent intent can be drawn to affect these preferred creditors in the whole series of instruments sought to be set aside. But, leaving the general aspect of the case, we come to the practically more important matter, of the relations of Beadleston & Worz to the transaction, the instruments executed in their favor and that subsequently made by them, and their attitude to the case with reference to the personal property embraced in the bill of sale to them, executed on August 3, 1893.

This transaction is separated from the general subject because the practical result of the litigation has been to charge Beadleston & Worz and Mrs. Cottentin and Drizal with liability and the entry of a money judgment for the value of the merchandise embraced in the bill of sale. The theory of the plaintiffs with respect to this independent transaction is that, from the time of the delivery of the bill of sale down to the final transfer to Mrs. Cottentin and Drizal, there was one distinctly traceable purpose of putting that merchandise and the restaurant business in such a shape that unprotected creditors of Cottentin could not reach it, and, if the proofs support that contention, the judgment charging these defendants with liability was right.

The series of transfers certainly begins with record relations established between Leon Cottentin, Mrs. Cottentin and Beadleston & Worz, and the last of the record relations effected by the instruments are also between the same parties, for, in the consideration of the independent transactions in which Beadleston & Worz were interested, we regard Abbott as being only an agent of that corporation. The bill of sale to Beadleston & Worz was dated the 3d of August, 1893; the mortgage of Leon Cottentin to his wife upon the lease of the premises in Cortlandt street, where the restaurant business was carried on, was of the same date. There was a consideration for each of those instruments. There can be no doubt of the $5,000 indebtedness of Cottentin to Beadleston & Worz, nor can there be any doubt of Cottentin's indebtedness to his wife. What proof is there of any complicity or intention of

Beadleston & Worz to enter into a mere sham transaction with reference to this merchandise, or to enter into complicity with Cottentin to take a mere formal transfer of this property so that it might be preserved from the pursuit of other creditors of Cottentin? There was a valuable consideration for the bill of sale (*Seymour* v. *Wilson*, 19 N. Y. 420; *Murphy* v. *Briggs*, 89 id. 450); and if the Beadleston & Worz Company acted in good faith, and merely for the purpose of securing the satisfaction and payment of their debt, a good title was acquired. What was done by it? It had an appraisement made of the value of the stock in trade; procured the liquor tax license to be assigned by proper authority to it; put a man in possession, to whom it transferred its interest, to be held for it. The general supervision of the restaurant business was taken by that man; the net profits accruing from the business from August third to August twenty-third were received by him alone. All these circumstances indicate a *bona fide* transaction; not one of them indicates anything else. The only incident that could give them another complexion is the association of the bill of sale with the other transfers and conveyances by which Cottentin disposed of his interests in all the property he possessed, and the fact that twenty days after August third all of the transactions with reference to the bill of sale were undone and the restaurant, fixtures and chattels retransferred to Leon Cottentin. But a reason for that is given, namely, that upon a more careful examination of the articles transferred by the bill of sale of August 3, 1893, it was ascertained that they were very much less in value than the sum at which they had been taken by Beadleston & Worz. When the bill of sale of August third was made there was a complete relinquishment by Beadleston & Worz of the claim upon the $5,000 note; they had taken the bill of sale in satisfaction of that indebtedness. There is nothing in the evidence to indicate that this was a mere pretense or sham, and when the retransfer was made on August 23, 1893, the original indebtedness was restored and other security was provided for it, namely, the admission of Beadleston & Worz's claim thus re-established into the Ditmar trust and the putting into that trust, so to speak, of the dower interest of Mrs. Cottentin in the New Jersey property. We cannot find upon the evidence that these transactions from the third to the twenty-third of August were merely

or partly devices to aid Cottentin in keeping the property in his own hands so that he would be unmolested by other creditors. On the face of the transaction it seems to be reasonable that Beadleston & Worz was attempting honestly to secure its own claim and nothing beyond that. If it had shared in the intent imputed to it, it would have continued to hold the stock of goods under its bill of sale, or in the name of Abbott, instead of retransferring it on the twenty-third of August. The very transaction itself seems to indicate its good faith. But it is claimed that the fraudulent character of the transaction is to be inferred as matter of law from the fact that Cottentin retained possession of the restaurant; that is to say, of the premises upon which the business was carried on, and in which this personal property was located. It is not to be controverted that Cottentin did remain on the premises, apparently in the same position and with the same relation to the business and the property he had occupied before the bill of sale was made on August third. The retention of possession is sometimes not only a badge of fraud, but raises a presumption of fraud against creditors. But that question of fraud under the statute is one of fact, and it arises when the vendee is required to show a valid excuse for leaving the property in the vendor's possession. Finding, as we do, that the sale was not fraudulent, but was honest, it may not be necessary to consider this question of the change of possession at all. (2 R. S. 136, § 5.) It was held in *Hanford* v. *Artcher* (4 Hill, 285), referring to the case of *Smith & Hoe* v. *Acker* (23 Wend. 653), that a party claiming under a sale or mortgage of personal property, not accompanied with a complete change of possession, may rebut the presumption of fraud arising from want of delivery and change of possession, by proving that the transaction was in good faith and without any intent to defraud creditors; *not* by showing some excuse or reason why there had not been a change of possession, but by proper and relevant testimony to show the real *bona fides* of the transaction. And in *Mitchell* v. *West* (55 N. Y. 107) it was held by the Court of Appeals that the case of *Hanford* v. *Artcher* (*supra*) settled that point. But even if it became necessary in this case to furnish a valid excuse for Cottentin still being in apparent possession, it is to be found in the evidence on this record, namely, that Beadleston & Worz, through Abbott, took

possession so far as it could, without destroying the business of which it became the proprietors; that it put Cottentin in charge as manager, and paid him a salary; that it took the proceeds of the business and held that business for the period of twenty days, and until it became satisfied that it was to its interest, regardless of Cottentin, to surrender it back to him for the consideration of being restored to the position it occupied before it took the bill of sale, and its participation in the Ditmar trust.

We think, therefore, that in either aspect of this subject of possession, the defendant Beadleston & Worz has shown its innocent relation to the subject.

There remains for consideration the attitude in which Mrs. Cottentin and Drizal stand to the matters involved in this action. Was the transfer by Cottentin to them, which succeeded the retransfer to him from Beadleston & Worz, made by the parties thereto with intent to hinder and delay creditors? Mrs. Cottentin seems to have had nothing whatever to do personally with this transaction. It was all left to her husband. At the time at which that transfer was made she left the city of New York to go to Chicago, and really constituted her husband her agent for all the purposes of that transaction. Drizal seems to have had only a nominal interest in the matter, and it is perfectly clear upon the whole record that this transfer was nothing but a step in carrying out the purposes of Cottentin to keep this property in his possession, subject to the incumbrances upon it, as long as he could. We have already seen that none of the creditors secured can be fairly chargeable with knowledge or of complicity in that purpose of his. But the conclusion seems to be irresistible that Mrs. Cottentin was perfectly content to let her husband do whatever he pleased with the property, and she is chargeable with notice of his intention and of his purpose.

We are, therefore, of the opinion that the judgments should be reversed as to the defendants Beadleston & Worz and Ditmar, and a new trial ordered as to those defendants before another referee, with costs to the appellant Beadleston & Worz to abide the event, and that the judgments should be affirmed so far as the bill of sale and transfer of the merchandise and stock of goods from Cottentin to his wife and Drizal is concerned, with costs to the plaintiffs, to be paid by the defendants Cottentin and Drizal. The plaintiffs'

appeal from the order respecting costs should prevail to that extent. In the view we have taken of the merits of the case and of the *bona fides* of the transactions, it is unnecessary to consider any of the other questions arising upon either appeal.

Van Brunt, P. J., O'Brien and McLaughlin, JJ., concurred.

Judgments reversed as to defendants Beadleston & Worz and Ditmar, and new trial ordered as to them before another referee, with costs to appellants to abide event; and judgments affirmed, so far as the bill of sale and transfer of the merchandise and stock of goods from Cottentin to his wife and Drizal is concerned, with costs to plaintiffs, to be paid by defendants Cottentin and Drizal.

---

Adamant Manufacturing Company of America, Respondent, *v.* Lewis Z. Bach, Appellant, Impleaded with H. P. Binswanger Company.

*Contract to plaster a "seven-story building, * * * according to plans furnished," construed.*

A contract to plaster "your seven-story building, * * * according to plans furnished us by your architect," is to be construed as a contract not to plaster all of the "seven-story building," but to plaster it "according to plans furnished;" and the contract not being formal and no specifications having been furnished, it is competent upon the trial of an issue as to whether the contract embraced the plastering of the basement and bulkhead of the building, to show what was said between the parties in regard to the portions of the building to be plastered.

In such a case it is not improper to exclude evidence of the custom of the building trade as to what is included in the expression a "seven-story building."

Barrett, J., dissented.

Appeal by the defendant, Lewis Z. Bach, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 16th day of July, 1897, upon the decision of the court rendered after a trial at the New York Special Term in an action brought to foreclose a mechanic's lien.

The lien was filed by the plaintiff for work and materials furnished under contract with the defendant Bach, the owner of an apartment house at Park avenue and Eighty-first street in the city of New