MAE DIAMOND, as a Director and Stockholder of JAROLD SHOPS, INC., Suing on Behalf of Herself and the Right of Said Corporation, Plaintiff, *v.* EVELYN DIAMOND et al., Defendants.

Supreme Court, Special Term, New York County, September 18, 1951.

*Percival E. Jackson, Norman P. S. Schloss* and *Milton Olewe* for plaintiff.

*Jay Leo Rothschild* for defendants.

DiFALCO, J. This is a derivative stockholder's action, brought on behalf of Jarold Shops, Inc., by the plaintiff, Mae Diamond, who was and is a director and an owner of 50% of the capital stock of the corporation. The action is part of a consolidated action, the other branches of which have been discontinued. The defendant, Evelyn Diamond, was and is a director and the owner of the other 50% of the corporation's stock. Plaintiff asserts that defendant, together with plaintiff's husband, now deceased — who, on plaintiff's designation, was made and functioned as the president of the corporation — conspired to and did mulct the corporation of substantial sums, which plaintiff would now have restored to the corporation. The defense is, in substance, that plaintiff had knowledge of all that was done, relied entirely upon what was done by her husband, who acted as her agent, and participated in the acts complained of, and benefited thereby.

The issue thus presented is one of fact, i.e., as to whether the plaintiff had knowledge of and participated in that as to which she now complains. Reference will hereafter be made to the individual defendant, as defendant.

The material facts are as follows:

The controversy has a long and sordid history, much of it shedding light on the issues of credibility involved.

Prior to 1932, the four Diamond brothers (one of them B. Diamond, plaintiff's husband, and another A. Diamond, defendant's husband) operated a chain of retail women's apparel stores under the name of Diamond Brothers. Before her marriage to B. Diamond, plaintiff had been an employee in the business. Defendant was also an employee. In 1932, the four brothers were adjudicated bankrupts, in the Southern District of New York. In 1934, the Diamond Brothers Apparel Corporation filed a petition for rearrangement under chapter 10. Thereupon, in 1934, the New York corporation here involved, was organized. The stockholders were defendant (who was then affianced to A. Diamond) and the children of the two brothers, other than plaintiff's husband and defendant's husband. Defendant subscribed for half of the contributed capital, i.e., $5,000; and the others, $5,000. But plaintiff's husband and defendant's husband administered, managed and controlled the business. In the ensuing years, the stock issued to the children of the said two other brothers, was acquired by and transferred to the cor-

poration. Accordingly, by 1940, all the outstanding stock was, of record, owned by defendant, but the stock certificates themselves were kept in the corporation's safe-deposit box, to which the defendant did not have access. During the period in question, there were also two other corporations, known as Jarold Shops of Nebraska, Inc., and Jarold Shops of South Dakota, Inc., both organized under the laws of Delaware, the issued stock of which was owned by the defendant. While the affairs of these two affiliated companies were also, to the extent appropriate, the subject of investigation during the course of the trial — because withdrawals of cash, to which reference will hereinafter be made, were made from those corporations also — they were not made parties defendant, and, therefore, no special reference need further be made as to them.

The business did not prosper until 1942. Then, plaintiff's husband and defendant's husband organized a practice of withdrawing funds from the corporation, as part of the cash payroll, and for ostensible expenses, which cash they divided between themselves as if they were partners. Plaintiff's husband administered the withdrawal of such cash, and, until ultimate division with his brother, was custodian of the cash, which he deposited in the corporation's safe-deposit box, to which box, as has been observed, defendant did not have access. Some of the cash was delivered by plaintiff's husband to plaintiff, and, by her, deposited in her personal bank account.

In June, 1942 (the defendant having become the owner of additional shares of stock of the defendant corporation declared as a dividend), plaintiff's husband asserted ownership in and demanded that one half of the corporation's stock be issued to him. There were differences and consequent negotiations between the plaintiff's and the defendant's husbands, as to what proportion of the stock plaintiff's husband should receive. By this time, defendant and A. Diamond were married. Instructions were finally given to the corporation's attorney, who was also the attorney for the brothers, to transfer one half of the stock of all the three corporations to plaintiff's husband. But, before the transaction was completed, and on November 4, 1942, defendant's husband died, while on business of the corporation, at Shawnee, Oklahoma. Upon being advised of her husband's death, defendant, on the same day, i.e., November 4, 1942, proceeded to Shawnee, Oklahoma. On the next day, November 5th, while defendant was thus away, plaintiff's husband removed the substantial amounts of cash which had been accumulated by him in the corporation's safe-deposit box in a midtown bank, and

redeposited the same in another safe-deposit box, in another midtown bank, which he had that day rented for that purpose. At the same time, there were removed from the corporation's safe-deposit box the stock certificates of the corporations, issued to defendant, but said certificates were not placed in the new safe-deposit box, but were delivered to the corporation's accountant, who was present to receive them and who kept them in his custody and sent a memorandum of what they were, to the corporation's attorney. The removal of the contents of the corporation's safe-deposit box, and the redistribution of said contents, as aforesaid, was quite hurried. Plaintiff's husband according to plaintiff's testimony, was routed out of a sick bed for that purpose, by the corporation's accountant, who accompanied him downtown and then brought him back home to his sick bed. The new box selected by plaintiff's husband was opened in the name of plaintiff, with her husband named as deputy, and plaintiff herself indorsed her name as principal on the safe-deposit company's signature card. In view of that fact, plaintiff's extended effort, on the trial, to establish that she did not accompany her husband on his visit to the corporation's safe-deposit box, and did not accompany him when the new box was rented, is beside the point. Just what mechanics were employed, is immaterial. The undoubted fact remains that whatever was done, was done with plaintiff's knowledge and participation, as evidenced by her own signature on the new safe-deposit box rental card, and by the facts still to be recited. Her denials of any knowledge of the purposes and accomplishments of the hurried trip, are incapable of belief.

In the same month — November, 1942 — plaintiff's brother, one Gerber, was employed by the corporation. The evidence is clear that Gerber, at all times, acted as an instrumentality of plaintiff and of her husband, and kept plaintiff advised of all that occurred in the corporation's affairs.

After defendant's return to New York, controversy developed between plaintiff's husband and defendant — undoubtedly created by defendant's demand for her deceased husband's share of the accumulated cash, and plaintiff's husband's insistence upon receiving 50% of the corporations' stock. Plaintiff's husband indorsed his deceased brother's name on salary checks, which, because the brother had been away, had not been delivered to him; and plaintiff's husband refused to pay to defendant the proceeds of said checks, which he had appropriated for himself, or to divide the cash, which plaintiff's husband had **redeposited in the new safe-deposit box, rented by plaintiff and himself.**

Acrimonious negotiations ensued between plaintiff's husband and defendant, in which others participated, including the corporation's attorney. Plaintiff had full knowledge of these negotiations, and possession of material papers in connection therewith. Those negotiations extended from December, 1942, to May 27, 1943, when agreement resulted, reflected in written contracts. In the meantime, on January 30, 1943, plaintiff rented a safe-deposit box in the Corn Exchange Bank, 86th Street Branch, which was near her home, and in which bank plaintiff had her personal bank account. Plaintiff rented that box in the name of her husband, with access to herself as deputy. She referred to that box as " my safe deposit box ". On May 19, 1943, defendant rented a safe-deposit box in a midtown bank. The inference is inescapable that both plaintiff and defendant respectively rented said boxes in anticipation of the distribution of the accumulated cash, upon consummation of the agreements under negotiation, and the contemplated continued withdrawals of cash. On May 27, 1943, written agreements were signed, but, instead of plaintiff's husband, plaintiff was made a party thereto, and became the transferee, from defendant, of one half of the stock of each of the three corporations. The corporation's accountant produced defendant's stock certificates for transfer. The reason for the change in parties was that there was still some doubt as to whether plaintiff's husband's creditors could reach his assets. In an affidavit which had been given to induce the nominal settlement of a judgment against plaintiff and others, plaintiff's husband had said that he had no assets. Though plaintiff had, in an affidavit furnished by her, similarly sworn that she had no assets, the judgment was now satisfied. One of the agreements provided that, should plaintiff's husband die, defendant was to have an option, for a price calculated on book values, to acquire the stock, concurrently transferred by defendant to plaintiff. Plaintiff's husband had been quite ill for many years, and the fact that he might die was in the contemplation of the parties. The other of the two agreements, thus signed with plaintiff as a party, recognized that plaintiff had always been the equitable owner of 50% of the corporations' stock, and thus charged plaintiff, in the light of all the circumstances, with the responsibility for the siphoning of cash, beginning at least as early as 1942, of which systematic withdrawal of cash she undoubtedly had knowledge, and a part of which cash she received. It is undisputed that plaintiff's husband never had any bank account of his own, nor other safe-deposit boxes, nor any

personal investments, and that he did not participate in any activities other than for the corporation. It is also undisputed that plaintiff acquired possession of whatever funds her husband received. She testified that she knew of no other income which he had. Furthermore, a payment of $2,500 (constituting one half of defendant's original subscription for stock of the corporation, when it was organized in 1934) was made by plaintiff to defendant, on the closing on May 27, 1943, to reimburse defendant to that extent. The payment was made by plaintiff's check, drawn on her own account. Plaintiff's husband had no bank account.

On June 2, 1943, at a meeting of the stockholders of the corporation, at which plaintiff was present, plaintiff and her husband were elected as directors, and plaintiff's husband was made president. The defendant and her brother Murray Orbach were elected directors. New banking resolutions were adopted, upon defendant's insistence, permitting the signature of corporate checks only by defendant as secretary and plaintiff's husband, jointly, instead of by plaintiff's husband or defendant's husband alone, as theretofore. But the minutes were not then signed, and plaintiff's husband refused to give the resolutions to the banks until agreement was reached on the division of the accumulated cash, which he insisted should be only one third — instead of one half — to defendant.

On June 3, 1943, plaintiff withdrew $2,500 in cash from still another safe-deposit box which she had, and deposited that cash in her personal account, to cover the check for $2,500 which she had given to defendant on May 27, 1943, and which defendant was still keeping.

It is unnecessary to recite the history of other safe-deposit boxes rented by plaintiff, in her maiden name and in the name of her mother, and in which she admittedly deposited cash. Nor is it necessary to trace the early history of plaintiff's personal bank account, originally in the name of her mother, with herself as power of attorney, and, until 1943, in her maiden name, in which account she admittedly also deposited cash. Nor is it necessary to consider in detail plaintiff's brokerage and investment account, in her maiden name — of Mae Gerber — though, through the years, she was married to B. Diamond, and otherwise used her married name. Nor will it be profitable to analyze the obscure sources of the investments made in that brokerage account over the years. All of these circumstances are significant in that they establish that plaintiff preferred cash to any other medium, was accustomed to handle her financial

affairs surreptitiously and through others, as dummies, and did so with calculated regularity and purpose.

On June 7, 1943, plaintiff made her personal bank account joint, with her husband.

Then followed, though not without delay — due to disagreement as to whether defendant should receive one half, or only one third of the accumulated cash — distribution of said accumulated cash. The sequence of events was as follows:

On June 28, 1943, defendant, in writing, upon plaintiff's husband's insistence, approved the withdrawals of cash made during the lifetime of her husband. On July 29, 1943, approximately one third of the accumulated cash was delivered to defendant. The fact that only one third, instead of one half, of that cash, was thus delivered to defendant, continued to irritate her. This, together with the fact that plaintiff's husband also refused to deliver to defendant the proceeds of her husband's salary checks, which plaintiff's husband had, after his brother's death, indorsed in his brother's name and cashed, caused further controversy. The result was that, from August until October of 1943, while controversy raged, the practice of systematic co-operative withdrawals of cash, was discontinued. Instead, plaintiff's husband, who still had the power to sign corporate checks alone — because no new banking resolution certificate had been delivered to the bank — appropriated substantial sums. On October 19, 1943, defendant yielded, and a further understanding was reached. Plaintiff made available to her husband $2,500 in cash, which she withdrew from one of her safe-deposit boxes, and which cash her husband in turn delivered to defendant, upon defendant's surrender of the plaintiff's check for $2,500, which defendant had received on the transfer to plaintiff of one half of the corporations' stock. The written receipt which defendant signed, described the cash as having been received from plaintiff. At the same time, defendant, on plaintiff's husband's insistence, approved in writing all withdrawals of cash made after her husband's death, until said date of October 19, 1943. Plaintiff testified that it was on her own suggestion that the written approval of defendant was thus demanded and obtained. The cash proceeds of defendant's husband's salary checks, which plaintiff's husband had indorsed in defendant's husband's name, and cashed, were delivered to defendant.

Thereupon, on October 22, 1943, co-operative withdrawals of cash were resumed. Plaintiff's husband, as theretofore,

received salary in cash, as part of the payroll of the corporation, and in checks from the two affiliated corporations, and other expense account checks were distributed between defendant and plaintiff's husband. Plaintiff's husband's salary checks from the affiliated corporations, were cashed by the corporation's bookkeeper; the cash delivered to plaintiff's husband, and in turn by him given to plaintiff, who deposited the cash in the Corn Exchange Bank account. Plaintiff was unable to give any explanation for depositing cash instead of the checks themselves. No logical reason appears for the intervention of the step of first converting these checks into cash; and the conclusion is therefore inescapable that the purpose was to conceal the receipt of the additional cash sums supplementing those received by way of salary. Those sums were in substantial amounts, and always the proceeds of checks cashed by one of the bookkeepers. As confirming the conclusion that the preliminary cashing of the affiliate corporations' salary checks was for an ulterior purpose, there is the further circumstance that, for some unexplained reason, between October 25 and December 31, 1943, all checks — including those for salaries from the affiliated corporations — were deposited directly in the plaintiff's Corn Exchange Bank account, and indorsed, in her husband's name, by plaintiff personally. Plaintiff admitted that she received from her husband all checks and cash which he withdrew from the corporations, and that she was the only one who made deposits of checks and cash in the Corn Exchange Bank account. She rented successive safe-deposit boxes in the Corn Exchange Bank — each larger than the previous one. Plaintiff admitted that she put cash in the safe-deposit boxes. She even stated, in an affidavit, that none of the cash was deposited in the bank account — which, of course, meant that it was stored, either in safe-deposit boxes, or in her home. The evidence showed conclusively, however, that she deposited substantial amounts of cash in the bank account, also.

In November, 1943, the accumulated cash having been distributed, plaintiff surrendered the midtown safe-deposit box which she had leased a year earlier, and to which, in November, 1942, had been transferred the cash accumulated in the corporation's safe-deposit box. It is significant that this surrender was made on plaintiff's own signature — not only for herself, but in the name of her husband, which she wrote for him, too.

It is perfectly clear that, from 1942 until the death of plaintiff's husband, in 1947, plaintiff received all cash diverted by

her husband and representing his share, and either deposited the same in safe-deposit boxes controlled by her, or in her Corn Exchange Bank account. It was demonstrated that, in some of the years the cash which she deposited in the Corn Exchange Bank account was in excess of her husband's acknowledged income from all sources, and bore a relation to his share of the diverted cash which he received. Furthermore, the extent of said cash deposits made it impossible for plaintiff to maintain her standard of living (the evidence shows that she did not withdraw any amounts of consequence from her brokerage account) unless there were cash moneys available, other than the cash which she deposited.

In January, 1944, plaintiff's husband and defendant, with the full knowledge and participation of plaintiff, resulting from conversations had in plaintiff's presence in her own home, entered into an agreement with plaintiff's husband's nephew — he having been called to the military service — under which payments for services in fact to be rendered and actually rendered by the corporation to the nephew's corporation (engaged in a similar line of business) were paid in equal shares directly to plaintiff's husband and defendant. Said payments were made by weekly checks of the nephew's corporation. Every one of these checks for plaintiff's husband's share, for a period of over three years — i.e., from January, 1944, until October, 1947 — were delivered by plaintiff's husband to plaintiff, and by plaintiff indorsed in her husband's name, and deposited in the Corn Exchange Bank. That plaintiff knew of and participated in these diversions, there can be no question. She signed her husband's name, in indorsing not only the aforesaid checks, but hundreds of other checks in which he was named as payee, and deposited them in her account. As has been noted, she signed her husband's name on safe-deposit box signature cards. It is impossible to segregate these transactions from others, without their decisively characterizing all of them as co-operatively accomplished with plaintiff's knowledge and participation.

From the time of the corporation's employment of plaintiff's brother, Gerber, in November, 1942, until his discharge by defendant, in March, 1948, after plaintiff's husband's death, the difference between Gerber's ostensible gross salary of $125 per week and what he actually received — i.e., $50, or, later, $60 per week — to the extent of at least half, was actually received by plaintiff's husband, and, therefore, by plaintiff, and

the other half, at least for part of the period, by defendant. There is room for doubt as to whether defendant received her share from November, 1942, until May 19, 1943, when defendant testified she discovered that the difference between Gerber's salary as recorded on the payroll, and what he actually received, was being delivered to plaintiff's husband. However, it is unnecessary to resolve that issue. It is enough that plaintiff was a party to the arrangement with her brother, Gerber; knew of whatever was the extent of the diversions accomplished through him as a means, and was the beneficiary thereof. As in the case of the transactions with plaintiff's nephew, it is impossible to segregate the manipulation of Gerber's ostensible salary from all the other diversions, and to fail to characterize all of them by the same standard.

Whatever the reason, though it would seem clear that quarrel over division of Gerber's salary was the reason, in May, 1944, controversy again flared between plaintiff's husband and defendant. Defendant undoubtedly distrusted plaintiff's husband, and sought access to the corporation's safe deposit box. That controversy resulted in a repeated suspension of the co-operative withdrawals of cash, until December 1, 1944, following the granting to defendant of access to the corporation's box, for the first time in November, 1944. Thereupon, co-operative withdrawals of cash were resumed, and plaintiff's husband's cash share was received by plaintiff and either deposited in plaintiff's bank account, or kept by her at home, or deposited in safe-deposit boxes, in cash, by plaintiff.

According to defendant's testimony, which was not contradicted, in June, 1945, both she and plaintiff's husband, through the offices of the corporation's accountant, bought Treasury bonds, with accumulated cash available to each of them from the aforesaid withdrawals. Insofar as defendant's and plaintiff's husband's purchases are concerned, it is clear that such purchases of bonds were with cash released by defendant from her safe-deposit box and by plaintiff from safe-deposit boxes which she controlled. It is undisputed that, in June, 1944, plaintiff also purchased Treasury bonds directly. In June, 1946, according to testimony of defendant — which was not contradicted — another purchase was similarly made, by defendant and by plaintiff's husband, again through the offices of the corporation's accountant, with cash made available in the same manner and from the same sources.

On January 25, 1947, plaintiff rented another safe-deposit box in the Corn Exchange Bank, in the name of her husband, with access by herself as deputy. Less than two months later — on March 4, 1947 — plaintiff surrendered that box, signing for herself and, with the signature of her husband, for him too. In September, 1947, plaintiff's husband became seriously ill. While he was thus ill, at home, the corporation's bookkeeper, delivered to plaintiff personally, at her home, not only plaintiff's husband's salary check but also one half of the cash diverted in the current two weeks. There cannot be any question but that plaintiff knew and appreciated the nature and character of this cash, so received by her.

On October 5, 1947, plaintiff's husband died. Plaintiff was thereupon elected treasurer of the three corporations. Defendant was elected president, and plaintiff's brother, Gerber, and defendant's brother, Orbach, were elected directors. In the succeeding three weeks, plaintiff received and accepted three checks of her husband's nephew's corporation, reflecting payments for services rendered by the corporation here involved; salary checks of the corporation and of its two affiliated corporations, which checks she cosigned with defendant; and she cosigned payroll checks, including cash to be withdrawn, which cash, so withdrawn and diverted, she accepted. The diverted cash thus given to plaintiff, and accepted by her, was contained in envelopes, plainly indorsed with notice of the fact that they contained the extra diverted cash. Furthermore, plaintiff demanded that the weekly payments made by her husband's nephew's corporation, should no longer be made to her by check, but in cash. However, her husband's nephew refused to make cash available. That plaintiff knew and appreciated the character of the moneys thus received by her, there can be no question.

On October 24, 1947, plaintiff opened a third safe-deposit box in the Corn Exchange Bank. She testified that she transferred to that box what had theretofore been contained in the Corn Exchange Bank box, rented in the name of her husband, to which she had access. There is much confusion on this subject, due to the illegibility of the Corn Exchange Bank record. According to plaintiff, her husband's safe-deposit box, to which she had access, was sealed by the State tax authorities on October 20, 1947. According to the Corn Exchange Bank representative, the bank's records showed that such event did not occur until January 3, 1949. If the box was sealed on October 20, 1947, it

is difficult to understand how its contents could have been transferred on October 24th to the new box, rented by plaintiff on that date. If, on the other hand, the prior box was not sealed until January, 1949, the transfer of contents could well have occurred on October 24, 1947. Further confusion is added, in view of the fact that an order of the Surrogate's Court, to open the prior box, was not obtained until February 24, 1948 — on the very same day on which this action was commenced — and that, in the affidavit which plaintiff verified in support of a claim of exemption, she said there were assets of only $18,000 in " E " bonds, all owned by her, whereas, on the trial, she testified that, at that time, she had such bonds — some of them at home — aggregating $23,000. Evidence confirming that the box was not sealed until January, 1949, is furnished by the fact that plaintiff did not surrender the old box until January 26, 1949. However, more significant is the fact — free from doubt — that whatever was the actual date of sealing, and even assuming that the sealing occurred on October 20, 1947, two weeks elapsed between plaintiff's husband's death, on October 5, 1947, and the date on which plaintiff says the box was sealed, i.e., on October 20, 1947, during which period she had free access to the box. Accordingly, the inventory made by the State Tax Commission, over a year later — after this action was commenced — is of no particular significance, especially so, since plaintiff admitted that she had purchased Treasury bonds for which the proof shows that she paid in cash, and that she had in her possession a Treasury bond of the type which defendant testified had been purchased by plaintiff's husband through the corporation's accountant, the source of which bond plaintiff could not identify, and the payment for which she could not establish. Plaintiff also testified that she never cashed any of the coupons attached to the Treasury bonds, which would indicate reason for concealment of the acquisition of said Treasury bonds. Besides, plaintiff admitted that she kept securities, as well as cash, in her home, and admitted that the purchase of Treasury bonds was the subject of discussion between herself and her husband. Significantly, plaintiff's purchase of " E " bonds (as distinguished from Treasury bonds of the type purchased by her husband through the corporation's accountant) were, except for one purchase, not made in the years 1945 and 1946 — which were the years in which plaintiff's husband, through the accountant, purchased Treasury bonds for cash. In 1946, plaintiff made substantial deposits of cash in the Corn

Exchange Bank — in some cases, in excess of the aggregate salary drawn by her husband. The proof is overwhelming that plaintiff was at all times fully informed as to what were her husband's earnings, and, therefore, that she knew that sums in excess of said earnings were diverted cash withdrawals from the corporation. The probabilities are that plaintiff rented the new box on October 24, 1947, to receive cash which she expected would continue to be available from cash withdrawals from the corporations, in co-operation with defendant, just as had been the practice during the lifetime of plaintiff's husband. On October 24, 1947, controversy between plaintiff and defendant had not ripened. Such controversy did come to a head on November 1, 1947, when defendant exercised her option to acquire plaintiff's stock, with the result that this litigation and others, having a purpose to defeat the exercise of that option, followed.

There is an issue of veracity between plaintiff and defendant as to the conversations which occurred between them, following the death of plaintiff's husband on October 5, 1947, and defendant's exercise of her option to acquire plaintiff's stock, on November 1, 1947. According to plaintiff, she demanded that the business be run honestly. According to defendant, plaintiff demanded that the same practices, for co-operative withdrawals of cash, continue, as in the lifetime of plaintiff's husband; that plaintiff was irritated because defendant had reduced the amount of said cash withdrawals; that defendant said she would discontinue the entire practice, as she had done on two occasions before, whereupon plaintiff said that she would " break " defendant; that defendant thereupon determined to exercise her option to acquire plaintiff's stock. In the light of all the evidence, and of plaintiff's conduct, including the participation by her in the system of co-operative cash withdrawals in the three weeks following the death of her husband, the issue of veracity must be resolved against plaintiff. That she was a party to and a beneficiary of the co-operative cash withdrawal system, there can be no doubt. Plaintiff's denial of what the evidence clearly shows to be the facts, and the inevitable consequent conclusion that she was a party to the practices engaged in before her husband's death, make it impossible to believe that she complained of a continuation of those practices, and insisted upon an " honest " operation of the business. It is more reasonable to conclude that plaintiff complained of the reduction of the amount of diversions.

From November 1, 1947, to the time of trial — though, through all that period, defendant was in sole charge of the business, and, for the latter part of that period, plaintiff (having been removed from office) did not even cosign checks — there is no evidence of substantiated claim that there were any irregularities at all.

Complaint is made by plaintiff that defendant, during the lifetime of plaintiff's husband, diverted merchandise of the corporation to defendant's sister. The evidence is clear that whatever moneys were thus received from defendant's sister, were divided between plaintiff's husband and defendant; that plaintiff was fully informed as to these events, by her husband, her brother, Gerber, and the corporation's bookkeeper; furthermore, that, before plaintiff commenced this action, she had copies of records, which Gerber had made, as to these transactions, some of which records bear dates well before the death of plaintiff's husband; and, finally, that, since plaintiff received all cash acquired by her husband, she benefited by these transactions too.

Supplementing these observations, there is a long history of plaintiff's use of corporate funds for personal purposes, the benefits of which were divided equally between plaintiff's husband and defendant, which diversions, though not relatively substantial in amount, are quite significant in showing plaintiff's participation, personally, in diversional methods in the benefits of which she shared. There is, furthermore, satisfying evidence that plaintiff was quite familiar with the conduct of the corporation's business and the activities of its employees, and much evidence of ratification of all that was done, indicated by plaintiff's approval, after her husband's death, of accountants' bills for services rendered, which included review of the period in which the transactions occurred, of which transactions plaintiff complains. When these bills were approved, plaintiff undoubtedly had full knowledge of the material facts, and of what the bills covered. Indeed, if plaintiff's testimony is to be believed, she approved the accountants' bills while and after she was demanding of defendant that defendant conduct the business honestly.

When plaintiff's husband died, there was no trace of any of the very substantial sums which he had unquestionably received, and which plaintiff, just as unquestionably, deposited in her own account, but which she now claims never reached her. That she made no search for the funds which she says were diverted,

is indicative of the fact that she knew what had become of them. The evidence is conclusive that plaintiff received from her husband all income which he obtained, from all sources, and that he had no other investments or activities — in fact, that he had been ill for years, and did nothing at all but attend at the corporation's offices and remain with his family at home. Plaintiff's testimony, taken as a whole, and in the light of her suppressions, contradictions, inconsistencies and misstatements, is incredible.

Such being the facts, it necessarily follows that, were plaintiff to be permitted to recover in this derivative action, ostensibly for the corporation, she would so be permitted to recover for her own benefit, all over again, the funds which were diverted from the corporation with her knowledge, consent and participation, and of which diversion she has had the benefit. Such an inequitable result, equity cannot and will not permit. Since there are no other stockholders, though the form of the action is derivative, the real parties in interest are the individual plaintiff and the individual defendant, and, accordingly, the rights of the parties must be determined as if there were no intervening corporate vehicle (*Capitol Wine & Spirits Corp.* v. *Pokrass*, 277 App. Div. 184, affd. 302 N. Y. 734, and cases cited; *Erickson-Hellekson-Vye Co.* v. *Wells Co.*, 217 Minn. 361; *Bilhuber* v. *Bilhuber-Wawak Co.*, 245 Ill. App. 552; *Hartley* v. *Pioneer Iron Works*, 181 N. Y. 73, 78; *Little* v. *Garabrant*, 90 Hun 404, affd. 153 N. Y. 661; *Fitchett* v. *Murphy*, 46 App. Div. 181; *Parsons* v. *Hayes*, 18 Jones & Sp. 29). The *Capitol Wine & Spirits* case (*supra*) formulates, very clearly, the law applicable. In that case, the action was by the corporation to recover for misappropriation and waste of its assets by former officers and directors. At the time of the transactions of which complaint was made, the defendants owned only 75% of the corporation's stock. Thereafter, the entire outstanding stock of the corporation was purchased by one Sachs. Though it was held by the Appellate Division (p. 185) — and affirmed by the Court of Appeals — that " there would be a triable issue concerning whether there was unanimous ratification of these transactions by those who owned the stock when they occurred ", the corporation, as such, could not recover upon these wrongful transactions, in view of the fact that the present holder of all of its outstanding stock — who was, in effect, a representative of the 75% holder at the time of the transactions — was in no better position than the 75% holder, and that, therefore, it would be

inequitable to permit the present holder of all the outstanding stock to recover in the right of the 75% holder, who had been a participant in the wrongdoing. The rationale of the decision was that even the corporation, as such, could not recover, if in fact the recovery would be for the benefit of stockholders who themselves could not recover. " ' If a court of equity could not look behind the corporation to the shareholders, who are the real and substantial beneficiaries, and ascertain whether these ultimate beneficiaries of the relief it is asked to grant have any standing to demand it, the maxim that equity looks to the substance and not the form would be very much limited in its application ' " (p. 187, quoting from POUND, C., in *Home Fire Ins. Co.* v. *Barber,* 67 Neb. 644). The court then recited: " The same principle, that a suit cannot be brought by a corporation for the benefit of its stockholders, all of whom would be estopped from instituting it themselves in the corporation's behalf ". Obviously, therefore, if a corporation may not itself, as plaintiff, recover, because equity will pierce the corporate form and apply equitable principles as they affect the corporation's stockholders, it necessarily follows that a guilty stockholder may not, in a derivative action, purport to recover for the corporation, but actually seek recovery for himself. As stated by the court (p. 189): " The point is, that just as the courts of this State have long held that a corporation cannot sue where recovery would inure only to the benefit of stockholders none of whom could institute a derivative action due to ratification or estoppel, so now, under the same principle, a corporation cannot prosecute an action in which recovery would be for the sole benefit of stockholders all of whom would be precluded from instituting a derivative action ". Accordingly, any distinction such as attempted by plaintiff, in this case, between the corporation as such and 100% of its stockholders, cannot be countenanced, a fortiori, when, as here, it is the culpable wrongdoer who would champion the corporation and receive the benefit of any recovery.

No issue is presented as to what would be the right of plaintiff to recover in behalf of the corporation, were there any stockholders other than plaintiff and defendant, or were defendant a mere employee who, in violation of her duty to her employer, had diverted funds of the corporation without sharing by plaintiff in the benefits of those diversions, or without knowledge or participation by plaintiff, or were plaintiff merely guilty of omissions induced by defendant's fraudulent impositions.

Whatever defendant did, she did in co-operation with plaintiff's husband, who, in turn, acted with the full knowledge and participation of plaintiff and to her advantage and for her benefit. In an amount equivalent to whatever plaintiff would now recover, ostensibly for the corporation, she personally shared, to the extent of at least half. Therefore, by reason of one or more of the distinctions above stated, the authorities upon which plaintiff relies are without application — i.e., *Federbush* v. *Federbush* (88 N. Y. S. 2d 185); *Union Elec Co. of Mo.* v. *Boehm* (92 F. Supp. 177); *Roth* v. *Robertson* (64 Misc. 343); *McCarthy & Co.* v. *Hill* (51 N. Y. S. 2d 793, affd. 269 App. Div. 770, revd. 295 N. Y. 320). The distinction from cases in which there are other stockholders, is clearly pointed out in *Capitol Wine & Spirits Corp.* v. *Pokrass* (*supra*).

What plaintiff permitted and authorized her husband to do, she cannot now repudiate (*Krumm* v. *Beach*, 96 N. Y. 398, 404; *Moody* v. *Smith*, 70 N. Y. 598, 600; *Bonham* v. *Coe*, 249 App. Div. 428, 436, affd. 276 N. Y. 540; *Sommers* v. *Cottentin*, 26 App. Div. 241, 254; *Thompson* v. *New York Trust Co.*, 293 N. Y. 58), a fortiori, when as here, plaintiff received the fruits of her husband's acts (cases *supra,* and *Green* v. *des Garets*, 210 N. Y. 79, 81; *National Life Ins. Co.* v. *Minch*, 53 N. Y. 144, 149; *Sheldon Hat Blocking Co.* v. *Eickemeyer Hat Blocking Mach. Co.*, 90 N. Y. 607, 614, 616–617; cf. *Gerben* v. *Gerben-Hecht Rim Wheel Corp.*, 252 App. Div. 482, affd. 277 N. Y. 662).

*McCarthy & Co.* v. *Hill* (*supra*), upon which plaintiff chiefly relies, even if it were deemed to have authority notwithstanding the reversal by the Court of Appeals, has no application. In that case, the sole stockholder was found to be innocent of any wrongdoing, not to have had any knowledge thereof, and not to have had any benefit whatsoever from the wrongdoing. Were the facts otherwise, as in the case at bar, there can be no question but that the doctrine of the *Capitol Wine & Spirits* case (*supra*) would have prevented recovery, even by the corporation as plaintiff. Furthermore, defendant, in the *McCarthy* case, was not a costockholder at all, but a mere employee. Therefore, for all of these reasons, the principle that the corporate vehicle must be disregarded, had no application, but the case was one in which a corporate principal would hold an agent to accountability — i.e., one in which an innocent principal was seeking to recover from a disloyal agent. That the principal was a corporation, was a fortuitous and immaterial circumstance. Like the cases cited in the Special Term opinion in the

*McCarthy* case, the proposition for which the Special Term *McCarthy* opinion stands is no more than that, where the omissions of the principal are produced by the fraud of the agent, such omissions of the principal do not constitute negligence which will bar the principal from obtaining relief. Similarly, where the negligence of the principal is not so reckless as to justify a conclusion of bad faith on the part of the principal. Different from the agency cases, above cited, the principal's omissions, in the *McCarthy* case (considering the plaintiff corporation and its sole stockholder as one and the same), did not constitute gross negligence amounting to bad faith, but were the result of imposition upon the corporation and its sole stockholder by the faithless agent and the corporation's bookkeeper. And, very important, the principal (whether considered as the corporation or the sole stockholder) did not receive the benefit of the agent's wrongdoings. It is not every act of omission which constitutes such negligence as will bar a plaintiff from relief. It is such gross negligence which, in law, amounts to bad faith (cf. *Ultramares Corp.* v. *Touche,* 255 N. Y. 170, 186, 189). Each case must be decided on its own facts. The facts in this case permit of no conclusion but that plaintiff was a conscious participant in all that occurred. It was plaintiff who, through her husband, co-operated throughout with defendant.

Moreover, bearing in mind that plaintiff, with defendant, were and are the sole stockholders of the corporation, and that plaintiff would therefore profit from her own wrong (cf. *Curtis* v. *Welker,* 296 F. 1019 — applying the New York rule of noncontribution between tort-feasors; also, Civ. Prac. Act, § 211-a), equitable principles prevent any apportionment of responsibility and forbid that one guilty of inequitable conduct may call a joint tort-feasor to equitable account. " Equity does not make adjustments as between wrongdoers, but does bestir itself to prevent a wrongdoer profiting from misconduct " (*Jacobellis* v. *Prudential Ice & Coal Corp.,* 244 App. Div. 255, 259, mod. 269 N. Y. 632). (To the same effect: *Morse* v. *Morse Dry Dock & Repair Co.,* 249 App. Div. 764.) *Little* v. *Garabrant* (90 Hun 404, affd. 153 N. Y. 661, *supra*) is also in point. There, in an analogous situation, where all the stockholders had assented to a diversion of funds, it was held that no cause of action could be asserted in behalf of the corporation.

The fact that tax irregularities resulted, is immaterial, especially in view of the fact that there is no claim of insolvency,

nor assertion of any creditors' rights. Tax irregularities were involved in *Capitol Wine & Spirits Corp.* v. *Pokrass* (*supra*) and *Bilhuber* v. *Bilhuber-Wawak Co.* (*supra*) and yet recovery denied. (See, also, *Robertson* v. *Schoonmaker,* 158 Misc. 627, 636.) Where creditors' rights are not being prosecuted or, for that matter, being prejudiced, it is fundamental that a culpable wrongdoer cannot invoke the processes of equity — not even in the guise of a champion of the rights of nonexisting others. This action is solely between plaintiff and defendant. Whatever may be the rights of third persons, including the governmental authorities, are not and will not be prejudiced by the judgment in this case.

From whatever viewpoint the facts be appraised, it is clear that plaintiff's husband and defendant did not conspire together to cheat the corporation and thereby the plaintiff, but that, on the contrary, plaintiff was content that her husband and defendant should do as her husband and his brother had done before, and to continue to receive the benefits of what her husband did as her agent, which benefits she in fact did receive, with ample knowledge of all that her husband and defendant were doing — in fact, that she was a guilty participant in everything of which she complains and enjoyed the ill-gotten gains. Accordingly, the complaint must be and is hereby dismissed, with costs.

The foregoing constitutes the decision of the court. Settle judgment accordingly.